[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter comes before the court as a limited contested dissolution of a marriage between the parties which occurred on April 29, 1978 at Wauconda, Illinois. The wife's prior married name was Wendy J. Smith and her maiden name was Wendy J. Wilcox. The plaintiff has resided continuously in this jurisdiction twelve (12) months next before the filing of this complaint. Two children were born to the wife since the date of the marriage: Nathan M. Reed, born June 10, 1980; and Blake J. Reed, born December 10, 1981. Neither party nor their children has received state assistance. The court finds that the marriage has broken down irretrievably and a decree of dissolution may enter on the grounds of irretrievable breakdown.
At the time of trial, the plaintiff wife was forty-five (45) years of age, and the defendant husband forty-six (46) years of age. There was no evidence of any health problems of any significance of either party. The parties disagree on the extent to which their sons suffer from emotional and/or health problems, and also disagree on the nature and extent of the treatment of these problems. Since 1990, approximately seventeen different mental health professionals have been involved with the family in the treatment of one or both of the boys. Nathan currently is a special education student at Ridgefield High, categorized as having social emotional problems, a gifted learning disability, oppositional defiance, and attention deficit disorder. His current treatment for his difficulties is only through the school as he refuses other treatments and medications. Blake also is a special education student who has been outplaced at Grove School which is a residential facility. He is characterized as gifted learning disabled and having an attention deficit disorder with hyperactivity. The cost of the Grove School is $52,000 a year, approximately $42,000 of which is paid by the Ridgefield School CT Page 8894 District. The plaintiff attends therapy with her son at Grove School. In order to maintain the placement, the plaintiff must continue to reside in Ridgefield.
The boys' difficulties the year prior to the trial of this matter resulted in fifteen PPT meetings, eight of which were for Nathan and seven for Blake. During this same time period, some of the boys' behavior have resulted in suspensions from school. In the late summer of 1994, both boys ran away from home on different occasions. In September of 1994, after Blake had run away from home for the second time, when he was on his way to see his maternal grandmother in Hawaii, Mrs. Reed learned that the school had found a suicidal letter. After his return from Hawaii, there was an incident where Blake threatened some individual with knives. Soon afterwards, he was admitted to Four Winds Hospital. This admission was discussed with Mr. Reed who at that time thought that the situation had been overrated. Blake was released from the hospital on October 31. The amount due to the hospital for his hospitalization, which was not paid for by insurance, is $6,457.
On August 20, 1994, Nathan had a serious bicycle accident which left him unconscious on the side of the road. Days after his emergency room treatment requiring stitches and a CAT scan, and a second CAT scan the following day, he ran away from home, still with the stitches in him. On this occasion, he was gone overnight and located by the police sleeping in the laundry room of a condominium complex. Another incident with Nathan involved his running out of an orthodontist appointment, pretending to shoot his mother with his fingers while asking her if she wanted to live. On this occasion, he was also gone overnight. Nathan ultimately was also hospitalized at Four Winds Hospital, and the amount due for his hospitalization is $21,107.
According to the plaintiff's testimony, Blake is now making progress in realizing how his behavior affects other people, and has learned now to ask for time out if he needs to "calm down." She also notes a positive change in Nathan's behavior. Although neither party presented any expert testimony regarding the need or lack thereof for the therapeutic intervention measures taken here, it appears to the court that the behavior exhibited by both boys required at least some level of professional intervention. Unfortunately, the geographical distance of the defendant, as well as the time constraints imposed by his work, did not allow him the flexibility of intervening or personally assisting in any significant degree during this difficult time. CT Page 8895
The plaintiff had enrolled both boys in different camps, each for a three week period and represented that the cost of same, including purchases to prepare them for camp, totalled $2,900. The defendant made no agreement to pay for the camp expenses, but the plaintiff claims that he should pay for camp, or at least contribute to the cost, as he didn't help with the boys' supervision over the summer months.
In December of 1993, pursuant to a stipulation of the parties and order of the court, the plaintiff wife was to pay the unreimbursed medical expenses for the children. Her financial affidavit at that time reflected a weekly figure of $10 for unreimbursed medicals. The defendant's financial affidavit reflected a figure of $12.41 for the category of medical/dental.
At the time of the trial, Mr. Reed was laid off from his full-time position at Chinipad, but was currently employed by them as a consultant. His financial affidavit reflected a thirteen week gross average weekly income of $1,296.15. The plaintiff's financial affidavit indicated that she was unemployed at the time of the trial. She testified that she was seeking full-time employment. Her employment income, prior to the trial, consisted of doing some product demonstrations for William-Sonoma, where she hadn't worked since Christmas time. She did have one job scheduled in April and three at the end of May, which would consist of approximately four hours each at $10 an hour.
The December, 1993 order also provided that the defendant was to pay the mortgage, taxes and utilities on the family home. Pursuant to this order, neither party was to dispose of certain assets listed or the husband's financial affidavit. Pursuant to a subsequent agreement and July 18, 1994 order of the court, the defendant was permitted to withdraw $5,200 from a joint savings account to meet his expenses and his obligations of support for the plaintiff and the children. Again, in March of 1995, the parties stipulated to a court order that "$9,000.00 will be `unfrozen,' given the fact that the defendant lost his employment effective 2/28/95. . . ." The plaintiff was also provided with the sum of $1,000 pursuant to this order.
The parties' house was listed for sale. Although the husband signed the listing agreement on July 31, 1994, the house didn't go on the market until September of 1994, because the wife had not signed the listing agreement. The wife claimed that the CT Page 8896 reason for her delay was occasioned by the need for work to be done in the kitchen prior to listing which she performed, with the husband reimbursing her for the materials for same.
The court has considered all of the criteria of sections 46b-56,46b-81 and 46b-82 of the General Statutes together with the provisions of section 46b-62 and all of the evidence and the case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account"; Scherr v. Scherr, 183 Conn. 366,368 (1981); this court will not recount those statutory criteria and the evidence, other than as has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman, 188 Conn. 232, 234 (1982). Suffice to say that the court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding; Leo v. Leo, 197 Conn. 1, 5 (1985); and that the court need not give equal weight to each factor.Kane v. Parry, 24 Conn. App. 307, 313-14 (1991).
In dividing and/or assigning property, the court must consider the liabilities of the parties, the opportunities of each for future acquisition of capital assets and income, and the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates. Dubicki v. Dubicki, 186 Conn. 709, 714-15;Corbin v. Corbin, 179 Conn. 622, 624.
The parties presented to the court a written agreement resolving all issues except the wife's claim for a contribution towards the unreimbursed portions of the bills due to Four Winds Hospital, her claim that the plaintiff pay or contribute to the cost of summer camp, the husband's claim for rent or use and occupancy payments from the wife toward the expenses of maintaining the family home, and a determination of the responsibility for payment of the house utility bills until the sale.
The terms of the agreement provide that so long as the husband is unemployed, he shall use the funds in the Kemper money market, the Abbott Labs and Apple Computer stock, and the parties' 1994 tax refund to pay the mortgage, taxes and insurance on the residence. It was anticipated that these funds would be sufficient to cover those expenses through July 15, 1995. After that date, the husband was permitted to borrow funds from his parents, which sums were CT Page 8897 to be repaid from the closing proceeds prior to a division of same between the parties.
Having considered all of the statutory criteria, as well as the provisions of the agreement, and the previously agreed upon court orders releasing assets for the payment of living and house expenses, no rent or use and occupancy payments from the plaintiff to the defendant are ordered at this time. The plaintiff is responsible for the utility expenses at the residence.
No contribution is ordered by the defendant to the approximately $2,900 of camp expenses.
The defendant is ordered to pay to the plaintiff from his share of the proceeds of the sale of the marital home, an additional sum of $8,500 which the plaintiff is to use toward the payment of the Four Winds Hospital bills. The plaintiff is responsible for said bills and shall fully indemnify and hold the defendant harmless from same.
With the additional orders set forth above, the written agreement of the parties, dated April 7, 1995, is found to be fair and equitable under all the circumstances, and is approved and incorporated in its entirety in the judgment of dissolution. The provisions for the support of the minor children are found to comport with the Child Support Guidelines and Connecticut General Statutes, Sec. 46b-84(b).
The provisions regarding health insurance for the minor children shall be subject to section 46b-84(d). A contingent wage execution may issue.
Dennis, J.